E-FILED
Thursday, 12 September, 2019  06:12:37 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS, URBANA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO: 18 CR 20020 |
| | ) | |
| Timothy Cosman, | ) | |
| | ) | Hon. Judge Colin S. Bruce |
| Defendant | ) | |

**DEFENDANT COSMAN's SENTENCING MEMORANDUM**

Raymond G. Wigell
Huma Rashid
Wigell Law Group, Ltd.
20280 Governors Highway, Suite 204
Olympia Fields, IL 60461
(708) 481-4800
rwigell@wcdchicago.com
hrashid@wcdchicago.com

*Counsel for Defendant Timothy Cosman*

[September 12, 2019]

1

Defendant Tim Cosman respectfully submits this Sentencing Memorandum to aid this Court in determining an appropriate sentence. Tim Cosman is the rare defendant for whom a sentence of 1 day time considered served followed by the maximum term of probation and/or the maximum 5 year period of supervised release, or in the alternative a year and a day, would accomplish the goals of sentencing.

## INTRODUCTION

Tim Cosman grew up in rural Illinois and lived with his parents and brother in Huntley. His childhood was difficult, due to a very strained relationship with an abusive father and his parents' subsequent divorce, but he has done his best since childhood to maintain a positive outlook on life. "There are more good days than bad," he says with a smile. "And the good ones have a way of helping you put up with the bad ones."

The series of events that brings Tim Cosman before this Honorable Court is an aberrant failing brought on by sheer desperation in an otherwise law-abiding life filled with family, community, and productivity. Tim has learned through this process that this scheme had many far-reaching, harmful ramifications. He is deeply ashamed that he has stained his otherwise good reputation with this wrongdoing, dishonored his family, and defrauded the Government.

Tim now faces sentencing before this Court. Respectfully stated, a sentence of 1 day time considered served followed by the maximum term of probation and/or supervised release, or in the alternative a sentence of 1 year and 1 day, is "sufficient, but not greater than necessary" to fulfill the objectives of sentencing. 18 U.S.C. §3553(a).

**BACKGROUND**

**A. Personal Background**

Tim Cosman is a 44-year-old man who lives in Harvard, Illinois, with his wife and two sons. His mother, Joyce Cosman, resides nearby in Belvidere. Tim is very close with his mother and the two share an excellent relationship. He sees her very regularly as he is her main caretaker now, and performs tasks for her such as taking her to doctors' appointments, helping her run her household, and even buying and delivering groceries to her. Tim is particularly close with his mother because she was the non-abusive parent during his childhood, and he saw her work very hard to finally move forward with her life when she divorced Tim's father. Her long and varied career included such jobs as a beautician and a pastor. She is aware of the instant matter and supports Tim whole-heartedly.

Tim's relationship with his father is quite the opposite of the one he enjoys with his mother. Growing up, Tim's father, Bruce Cosman, had always been physically and verbally abusive to Tim. He never understood why, and it was something he lived with until he moved out of the house. His parents divorced when Tim was 25 years old, which meant Tim saw less of his father afterward. Still, their relationship continued, however strained and painful for Tim. "I thought there were some ties that just couldn't be cut completely," he says ruefully.

His mother is more willing to talk about the abuse Tim suffered all his life, since he was a small child and into his adult years, than Tim is. While he prefers to keep that personal information close to the vest, Ms. Joyce Cosman clearly still mourns the happy, joyful childhood her boys did not have. In her letter to this Court, she writes that "there are far too many incidences of abuse in our family that I cannot recount them all here." She details ghastly

3

accounts of violence and degradation that must have wore away at Tim like water smooths a stone. Growing up in that environment provides much-needed context in the instant matter, as will be explained in greater detail further herein.

Tim grew up a farmer, and helped his dad and his brother with the farm work. He became very familiar with the equipment, but also wanted to branch out into something that was more his own. He turned to the trades. Tim had a steady job working as an operator, mechanic and welder with the International Union of Operating Engineers, Local 150. He enjoyed the work and was good at it, and it enabled him to support his wife and their two sons for many years.

He is the kind of man that does not know what to do with himself if he is not working and being productive, a trait he learned from his mother and one that he has instilled in his sons. Tim started working at a young age, as a way to help support the family and make a little extra pocket money, and began his career as an operating engineer when he was 24 years old. He has always been a hard worker, and good with his hands, and the trade came naturally to him. He grew in confidence and flourished during his time with Local 150.

But when his father came around with the suggestion to go into business together and become farmers, Tim saw it as a new opportunity. "I guess I thought it would be good to get back to my roots, no pun intended there, and farming is such an important part of the ideals of America," he explains. "What's more American than growing the food that literally feeds our country? And … as much as we don't get along, I thought it would be really neat to have something with the Cosman name on it that I could maybe pass down to my boys if they wanted."

4

What was supposed to be an opportunity to create a bond with his father and make a good living for his family while owning and running a family business turned into the worst mistake of his life, due to a series of lapses in judgment.

"I trusted the wrong people – my dad, the loan officer at the bank that helped me sign documents I didn't really understand or agree with – but this was all me. It wasn't them. It's on me. I did it, I should have known better, I should have made better decisions, and I should have come clean immediately after I did the first thing. But I didn't do any of that, and I made it worse." He shakes his head wearily. "There's no excuse for it. The farm was going under, we were losing money hand over fist, my dad was making it worse and sticking me with the debt, and I was dumb and desperate. But I'm going to make it right if it kills me. Because at the end of the day it's no one else but me. The buck stops here, and I'm going to take that buck and pay it back to who I owe it to."

Since the incident, Tim has worked tirelessly to atone for his wrongdoing. He has cooperated with the Government and the FDIC on a continuing basis, sitting down for two proffers and forwarding voluminous documents to the agents investigating the matter to aid them in possible future and/or further investigations. He has been working around the clock in an attempt to save money to pay off his debts accumulated during this process. "I want to make it right, I want to make everyone whole," he says fiercely. "I hate feeling that I owe people money, and I do, so I'm going to work until I've given back every cent."

Although Tim has a pending bankruptcy matter, he is not seeking to be completely absolved of his debts. Rather, the bankruptcy matter has included a negotiated settlement in the

amount of $1.5 million with Busey Bank. The matter is still pending and the parties continue to work toward resolution.

Timothy Cosman made a series of mistakes and bad choices. He accepts full responsibility for his actions and is working hard to make all parties whole. He does this not because he hopes for a positive resolution, but because he knows it is the right thing to do, "and it's about time I did the right thing."

### B. Offense Conduct

How is it that a fundamentally good man – caring, hard-working, and sincere – who consistently rose to the challenges he faced, forged his path with hard work and determination, could engage in the conduct to which he has pled guilty?

There is no doubt that Tim's conduct resulted from bad choices made of desperation. A drowning man, he saw what he wrongly believed as his chance to keep his head above water and took it. This resulted in a significant loss to Busey Bank and the Government, and Tim now sees the error of his ways.

This is certainly not to excuse or justify any of the conduct in this matter; rather, the following is provided only to create context for that conduct, as called for by the United States Sentencing Guidelines (USSG). *See* 18 U.S.C. § 3553(a)(1).

Tim's relationship with his father had always been rocky and strained. Still, many children of abusive parents nevertheless seek that parent's approval as a means of validation and healing. This was true of Tim.

He had a successful career since he was a young man in the operating engineers' union. It was good, respectable work and he was good at it. But Tim has always been a jack of many

trades, master of several, and eager to embrace new challenges and opportunities. Even as a boy, he describes himself as "into everything," frequently taking things apart to see how they worked, exploring the land around him, and expressing a child-like curiosity about the world.

And so when his father approached him about going into business together and starting a farm, Tim was interested. He knew a few things about farming, loved a challenge and a new learning opportunity, and felt a strong desire to prove his worth to his aloof father. With his brother joining them in this family business, it all seemed like an excellent idea.

Tim embarked on a new adventure. He and his father incorporated an LC and LP, and got to work. The new farm would produce corn, soybeans, wheat, and cattle. It also required the purchase of equipment. Tim intended to do a good job at his newfound career, and to use farming as a means to support his wife and two boys.

He obtained a series of loans and lines of credit from Busey Bank, based in Champaign County, Illinois. He and his father offered crops, cattle, and farm equipment as collateral against these loans. Working with his father was a challenge, as their relationship had not changed despite Tim's hopes and efforts. He had gone into business with Bruce partly because, still carrying deep-seated memories of the abuse he suffered as a child, he wanted to work alongside his father and have his father see and value the hard working, intelligent, caring, and capable man Tim had become.

Those hopes proved unrealistic, and were never realized. Tim believes that door to be closed for good now. Bruce Cosman remained the abusive, aloof narcissist that he had been for all of Tim's life. He failed to give Tim the help and support he needed, and often made problems

worse when he interfered with the farm's finances and the loan and credit agreements with Busey Bank. Before long, Tim Cosman found himself very alone in this venture.

But farming life did not stop due to toxic relationships. The work continued, and after suffering a series of setbacks, the bills were piling up. Tim Cosman was growing desperate. The farm was squarely on his shoulders, he knew he could not count on his father except to make things worse, and his brother was largely absent from the mix. If the farm was to survive, it would be up to Tim to make it so.

Regretfully, Tim made several bad decisions. He submitted false documents on several occasions and did what he could to keep the scheme going. He was not spending the money he received from Busey Bank on fast cars and mistresses and vacations and drugs, or any other typical indicators of a lavish lifestyle. Rather, he used the money to try to keep the farm operating. His actions defrauded the bank of $8.9 million dollars.

After being approached by federal agents, Tim quickly turned things around. He retained counsel and cooperated quickly, meeting with FDIC agents to provide them with as much documentation of the scheme as he could. He sat with them in meetings and explained the process he went through, and provided details about certain bank officials as part of another FDIC investigation of Busey Bank unrelated to Tim himself.

He declared bankruptcy while continuing to negotiate a settlement with creditors, and as the matter worked its way through the court system, Tim worked hard to make amends. He went back to his career as an operating engineer, abandoning the dream of owning a farm, and certainly of working on anything with his father, with whom he has not spoken in quite some

time. He also suspected his father of shifting some of his own wrongdoing with the bank onto Tim, but did not let himself wallow in that suspicion.

What mattered to Tim was getting his creditors paid. He took up his old job, saved money diligently, used it to support his family and pay the bills, and put the rest toward his creditors. "I want to pay back every last dollar," he states forcefully. "I know it'll take some time, but that's what I'm going to do. I'm going to make this right."

Since the investigation began, culminating in Tim being charged, he has met with agents twice and submitted a thousand of pages of documents to aid them in their investigation into other matters involving Busey Bank.

Despite the sensational loss amount, this was not a get-rich-quick scheme, nor was it a coordinated attack on the federal government's financial backing of all FDIC-insured banks. Tim was not living a flashy life filled with sports cars and multiple homes and vacations and mistresses, or any other accoutrements of that lifestyle.  Rather, Tim was trying to keep a failing business afloat, to keep his head above water, and to salvage family relationships that had stopped being healthy decades ago. These were the actions of a drowning and desperate man just trying to stay afloat any way he could. Unfortunately, he made several wrong and illegal choices in his attempts to do so, for which he accepts full responsibility.

[this space intentionally left blank]

## DISCUSSION

**A. Sentencing Considerations**

The goal of sentencing is to impose punishment "sufficient, but not greater than necessary. 18 U.S.C. § 3553(a).[1]

Application of Section 3553(a)'s factors to this case leads to the conclusion that the instant matter is one of the rare criminal matters in which a sentence consistent with the Defense recommendation would be appropriate.

His otherwise law-abiding life, his community history in terms of employment, his deep connections to his family that the stress of this incident has only strengthened, the unique circumstances of his offense, the shame of ruining his good name and reputation in his small community, and his general remorse and fervent attempts to restore all affected parties demonstrate that a sentence consistent with the Defense recommendation is "sufficient, but not greater than necessary."

**1. The Nature of the Offense and the History and Characteristics of the Defendant:**

Analysis of the offender's character and the offense's nature show that both are unusual.

**a. Tim is not the typical offender.**

While bank fraud, loan fraud, under-collateralization, and/or lying about collateral are not an anomaly in the financial world, they are certainly an anomaly in this particular defendant's life.

---

[1] As this Court is no doubt aware that the U.S. Sentencing Guidelines are advisory, this memorandum shall not include a lengthy discussion of *Booker* and its progeny.

Born and raised in a small town and a dysfunctional home, Tim threw himself into his industry and worked hard as an operating engineer, learning everything he could about the trade. He excelled at it, and was proud of his work. He learned the craft of welding, and also became a diesel mechanic. He is a true salt-of-the-earth man who has never liked to rely on anyone for anything, preferring instead to work hard and be proud of what he has to show from his efforts.

He has enjoyed an excellent reputation in his small community and among those who work with him. As to his crimes, he has demonstrated acceptance of responsibility, has worked with the FDIC to help them in other investigations of similar loan fraud occurring at Busey Bank, and is trying to atone for his bad decisions.

His childhood and young adult life was troubled, and his relationship with his abusive father was not a positive one. Tim is reluctant to talk about it, however. He does not want to appear – to friends, family, colleagues, anyone – that he is spinning a 'woe is me' tale. He very much believes in pulling oneself up by one's bootstraps and making the most of what one has.

However, it is clear that his childhood affected him in many ways and shaped him to be the man he is now, and prepared him to view the world the way he does. He grew up never trusting his father, a man that should have been his role model. He grew up never feeling safe around his father, and as a result, safe at home. He grew up not feeling like he was ever good enough, smart enough, capable enough. Although he grew into a strong, caring, hard-working man that stood on his own two feet, those deep-seated wounds do not disappear on their own.

His failure to have a father that valued him or reinforced his self-worth led to him unknowingly always seeking that validation. When his father came to him with an idea to run a family farm, Tim saw it as more than a farm. He saw it as redemption, as healing, as acceptance

and trust. He saw it as a family endeavor. And that made him even more desperate to keep that venture going, to do anything he could to keep it from failing, because if it did, that meant any chance at his father's acceptance and love failed with it.

These are not logical or rational thoughts. Rather, they are the thoughts of a wounded and saddened child still hoping, decades later, for things to work out, for a safe home, for love and belonging.

Studies have shown that children who experience neglect in childhood, or fail to bond properly with their parents, have difficulties regarding relationships with others and conflict management during their adult lives. The problems that can result from impaired bonding can range from mild interpersonal discomfort to profound social and emotional problems. See, **Exhibit A,** "Childhood Attachment," Corrine Rees. British Journal of General Practice 2007; 57(544):920-22.

In Tim's situation, his circumstances engendered in him a fierce sense of independence and self-reliance, while still longing for the love and warmth of a stable family. Knowing from a young age that he could not and should not rely on his father for help, and not wanting to burden his stressed mother, Tim made it a point to tackle every problem by himself. While independence is an excellent quality, in Tim it became toxic. Rather than turning outward for help with the business, Tim turned inward, and engaged in the conduct that brings him before this court.

However, Tim's basic characteristics of overcoming difficult situations by relying on his own determination and vision remain good qualities, although they led him to commit these crimes. This determination and vision make Tim an excellent candidate for 1 day time served

and probation and/or the maximum term of 5 years supervised release, or in the alternative 1 year and 1 day in custody.

    **2.   The Purpose of Sentencing: Tim accepts responsibility for his crime, and the certainty rather than the severity of a sentence in relation to a federal felony conviction is more than sufficient to deter him and others.**

Sentences should fit the crime and have a deterring effect on both the offender and the community. A helpful perspective to enable the Court to make this important decision is to illustrate what makes the defendant unlikely to recidivate.

    **a.  Seriousness of the Offense, Respect for the Law, and Just Punishment**

Tim now well realizes the harm from the offense to which he has pled guilty, and knows that he has contributed to a serious harm to society and to the Government, which insures the banks that people rely on.

This Court can promote respect for the rule of law and ensure just punishment with the suggested sentence. There is no need for lengthy incarceration when such a sentence is "sufficient, but not greater than necessary" to satisfy the goals of sentencing.

Some commentators have argued that the USSG do not reflect public perception of just punishment. For example, one commentator found that a cross-section of the public would, on average, impose sentences 81% shorter than those called for by the USSG. *See* James S. Gwin, *Juror Sentiment on Just Punishment: Do the Federal Sentencing Guidelines Reflect Community Values?* 4 Harv. L. & Pol'y Rev. 173, 175 (2010).

The public generally supports significantly more lenient sentences than those called for by the USSG. This trend holds even for serious offenses. In one Iowa study, just 7% of burglary

<u>victims</u> supported a sentence of 1 year or more; 76%, on the other hand, wanted community service. (*See,* Marc Levin, *Remember and Empower Victims of Crime,* The Hill (April 11, 2014).)

In Tim's case, the principles of just punishment would be best served with a sentence consistent with the Defense recommendation. This Court should consider not only the offense conduct, but also Tim as an individual.

Tim has faced challenges in his life and has risen to them admirably. He has even responded well to the criminal prosecution that resulted from his wrongdoing by displaying acceptance of responsibility. He has been a hard worker all of his life, and continues to work as hard as he can so that he may pay back his creditors and those that were harmed during the commission of these acts.

Although none of this excuses his conduct, nor is it an attempt to diminish his conduct, it does provide context for his terrible decisions. The period of incarceration suggested by the Guideline range, driven mostly by the loss amount, is greater than necessary to provide just punishment for Tim.

### b. Deterrence

Other commentators argue that the length of a prison sentence has little to no effect on general crime deterrence. This Court can adequately deter criminal conduct with a sentence of probation. Numerous studies show that increasing the length of a prison sentence does not significantly increase deterrence; "lengthy prison sentences cannot be justified on a deterrence-based, crime prevention basis." *See* Daniel S. Nagin, *Deterrence in the Twenty-First Century,* 42 Crime & Just. 199, 201-02 (2013).

It is the certainty of punishment and not the severity of the punishment that in fact deters crime. See *United States v. Kloda,* 133 F. Supp. 2d 345, 347-48 (S.D.N.Y. 2001) (Hellerstein, J.) (in context of business crimes); *see also* Jeffrey Grogger, *Certainty vs. Severity of Punishment,* 29 Econ. Inquiry 297, 308 (1991) (concluding that the increased certainty of punishment generates significant deterrent effects while increased severity produces insignificant results).

With respect to Tim Cosman, who has a very minimal criminal background, even the certainty of impending felony charges, and the certainty of a felony conviction were significant deterrents that swiftly altered his entire life. A prison sentence will not provide additional deterrence any more than the Defense's recommended sentence.

It is also important to note that Tim has not engaged in these illegal practices since he was approached by FDIC agents. Since then, he has cooperated to the best of his ability, met with agents repeatedly, forwarded voluminous records, filed for bankruptcy, dissolved the businesses, abandoned farming and returned to his old job, and seeks to make his creditors whole again. He now understands the significant consequences of his actions, and how they have harmed him, his family, and his community.

This offense is a single act of aberrant behavior and a departure from an otherwise law-abiding life, due to economic circumstances, a family dysfunction, and grave lapses in judgment.

Additionally, as noted in the PSIR, Tim has no felony convictions. He has thus not proven to be immune to the deterrent impact of engaging with the justice system, much less actual incarceration. This is important, as it means that any sentence given, including the Defense recommendation, will serve as a deterrent in and of itself. A period of supervised release will also continue to deter.

The love and support of his family regarding a matter that started with Tim's shame and desire to handle his problems on his own without burdening his loved ones, is also a significant deterrent to committing additional crimes.

He has been married to his wife, Rebecca, for almost 25 years. They have a strong marriage and support each other through the good times and the bad. Together, they are raising two sons, one of whom is a minor. This matter has taken a tremendous toll on the family. Tim and his wife are extremely stressed about their future, with Tim working hard not only to pay his creditors but to save money for his wife and children, and his mother for whom he is the primary caregiver, in the event of his incarceration. His sons are taking the matter very hard, with his youngest spiraling out of control and refusing to open up even to the multiple counselors and therapists that Tim has taken him to. The boy has night terrors as he dreams of years of separation from his father, as Tim and his son have the kind of healthy, loving relationship that Tim only dreamed of having with his father before experience taught him it was not possible. The family hopes that they will be permitted to remain together as they rebuild their lives following Tim's mistakes. See, **Exhibit B, Letters of Support.**

A prison sentence will not serve either the purpose of specific deterrence or the purpose general deterrence. The suggested sentence will still accomplish this goal.

### c.  Protection of the Public

As to this factor, which amounts to incapacitation and recidivism, Tim has been incapacitated from committing any further crimes during the lengthy period of investigation, after which he was charged. He will be incapacitated from committing any additional crimes for

a term of years to come if he is placed on probation, as well, as he will be under the supervision of the courts and will be grateful for that opportunity.

Tim's entire family now knows of the wrongdoing, and have offered their help and supervision. As a result, he is now able to speak more honestly with his mother, with whom he has always been close and is now even closer, and his wife, who he previously tried to protect from his own burdens. Problems are now dealt with as a family team.

He is also now scrupulous in how he conducts his business affairs. This investigation and subsequent prosecution has impressed upon him nothing more than the fact that every federal and/or state rule or regulation that impacts how he conducts his affairs is serious, pertinent, and must be scrupulously followed. He has also abandoned the farming venture and has no plans to return to it.

According to a report issued by the U.S. Sentencing Commission in 2004, offenders who are 26 years old with a criminal history category of II have a non-recidivism rate of around 70%, and that rate continues to increase (making recidivism less likely) as the age of the offender increases. Tim is 44 years old, with a date of birth of June 17, 1975.

The Seventh Circuit has recognized that age is a ground for varying from the USSG range because advanced age reduces a defendant's risk of recidivism. *See, e.g., United States v. Carter,* 538 F.3d 784, 792 (7th Cir. 2008); *see also United States v. Wachowiak,* 496 F.3d 744, 753 (7th Cir. 2007) (citing *United States v. Wallace,* 458 F.3d 606, 613 (7th Cir. 2006)).

Although Tim certainly is not as long in the tooth as many defendants that come before this Court, he is certainly old enough to know better moving forward.

It is clear, based largely on his family's support, as well as his own deep shame at ruining his carefully built reputation, that Tim poses a low risk of recidivism.

### d.  Rehabilitation of the Most Effective Manner

Rehabilitation of the defendant should be the *primary* concern of sentencing. Typical concerns often involve educational or vocational treatment, in additional to medical treatment, that the defendant might avail himself to while in the custody of the Bureau of Prisons (BOP).

It is important to note here that Tim is an atypical offender in that he does not strictly require the educational or vocational skills that BOP may be able to provide. He has a high school diploma, and was employed at the time the Information was filed.

Should he be sentenced to a term of prison, he hopes to be able to work upon his release. He knows many crafts and has many certifications and hopes to be brought on by his union once more. While Tim might well benefit from the programs offered by BOP and would take advantage of them, they are not necessary as a part of his rehabilitation.

Additionally, he is in a unique position in that he is still young enough to take full advantage of any rehabilitative programs that the BOP has to offer, and yet old enough to not involve himself in obvious trouble areas that exist within the penitentiary system.

It is Tim's family, however, that have already proved to be the biggest form of rehabilitation for him. He loves his wife and his sons, and is so humbled and grateful that he has the kind of relationship with his two sons that he dreamed of having with his own father. He is terrified of leaving them and worries for their well-being if he is incarcerated. The concept of rehabilitative justice necessitates that we take this concern into account.

This further supports the suggested sentence.

Many people convicted of felonies have few prospects upon release. Faced with a new criminal record, no additional skills, loved ones who have moved on with their lives and fail to offer support, and a world that has changed drastically since they were last a part of it, re-assimilating into society can be a daunting task for many criminal defendants.

This will be true for Tim, if he is incarcerated. Although he has the support of his family and friends, as well as the capacity for legitimate work, his prospects will be greatly reduced. In being incarcerated, Tim will be removed from the many positive social influences in his life, and be placed in an environment famously bereft of positive influences.

It is easier for a defendant who enters prison with remorse, determination, and hope to keep their motivation to change their lives alive when they are facing a shorter sentence than a longer one. This is even truer for a defendant who is allowed to serve a sentence of probation, or a sentence of 1 year and 1 day, when lengthy incarceration will prove so deeply destructive and debilitating.

### 3.   The Sentences Available: Probation is the Best and Most Just Option

At this time the Court has no doubt thoroughly reviewed the executed plea agreement in this matter, and is aware that the anticipated Guideline range is 41-51 months. But Tim Cosman is one of the rare criminal defendants for whom the suggested sentence is the most just option.

This Court has the discretion to order a wide range of punishments as an alternative to the incarceration called for under the USSG. Respectfully, considering sentencing's objectives and the community's interests, the suggested sentence is appropriate in this matter.

The sentences suggested would satisfy the remedial goals of sentencing. Tim accepts his wrongdoing and appreciates its consequences and poses no risk of recidivism.

### 4.  The Need to Avoid Unwarranted Disparities

Sentencing Tim to probation will not create unwarranted disparities but rather will be in keeping with sentences that take into account a defendant's circumstances and their impact on their community. See *United States v. Bendtzen,* 542 F.3d 722, 728-29 (9th Cir. 2008) (bank robbery case in which a fake bomb was used, an 80-month sentence was affirmed as reasonable, despite the applicable 92-115 month range, based on offense level 20 and criminal history VI, where the defendant suffered childhood abuse, was extremely remorseful, and "had drug and alcohol problems that contributed to the offense").

Where, as here, a lengthy custodial sentence is not required to meet the objectives of sentencing, courts issue noncustodial sentences – even when the USSG calls for significant prison terms far beyond what the prosecution requests in this case. *See, e.g., United States v. Cole,* 765 F.3d 884 (8th Cir. 2014) (135-168 months per the USSG); *United States v. Rowan,* 530 F.3d 379, 380-81 (5th Cir. 2008) (46-57 months per the USSG); *United States v. Pyles,* No. 06-4522, 2008 WL 920451, at *1 (4th Cir. Apr. 4, 2008) (63-78 months per the USSG); *United States v. Roque,* 536 F. Supp. 2d 987 (E.D. Wis. 2008) (87-108 months per the USSG).

By ordering a sentence consistent with the Defense recommendation, this Court would be one in a line of sentencing judges to recognize that noncustodial sentences sometimes better meet sentencing's objectives for first-time nonviolent defendants.

### 5.  The Need to Provide Restitution

Tim Cosman has filed for bankruptcy and is working to see to it that his creditors are paid to the best of his ability. When this court orders restitution, he will work diligently to pay that as well. He is also in the process of negotiating a settlement with Busey Bank as part of his

bankruptcy matter, and should a settlement be reached in that matter, it is important to take that into consideration as part of the sum Busey Bank is to receive.

## CONCLUSION

Tim Cosman is a remorseful man who is working tirelessly to atone for his crimes. If the goal of sentencing is to punish no more than is necessary, and to rehabilitate an individual, that goal will certainly be met in this matter with a sentence of 1 day time served and probation and/or the maximum 5 year term of supervised release, or 1 year and 1 day. Such a sentence warrants serious consideration in light of this unique defendant.

Respectfully Submitted,
*/s/ Raymond G. Wigell*
Raymond G. Wigell

*/s/ Huma Rashid*
Huma Rashid

Wigell Law Group, Ltd.
20280 Governors Highway, Suite 204
Olympia Fields, Illinois 60461
(708) 481-4800 Office
(708) 481-4848 Fax
Email: rwigell@wcdchicago.com
        hrashid@wcdchicago.com

21

**Certificate of Service**

I hereby certify that on September 12, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all appropriate parties, including AUSA Ryan Finlen.


By:   */s/ Huma Rashid*

HUMA RASHID
Wigell Law Group, Ltd.
20280 Governors Highway, Suite 204
Olympia Fields, IL 60461
(708) 481 – 4800 Office
(708) 481 – 4848 Fax
Email: hrashid@wcdchicago.com

22